## SUMMIT HYDROPOWER PARTNERSHIP *v.* COMMISSIONER OF ENVIRONMENTAL PROTECTION ET AL.
## (14618)
## (14619)

PETERS, C. J., CALLAHAN, NORCOTT, KATZ and PALMER, Js.

Argued May 4—decision released August 3, 1993

*David H. Wrinn,* assistant attorney general, with whom, on the brief, were *Richard Blumenthal,* attorney general, and *Joseph Rubin,* assistant attorney general, for the appellant in Docket No. 14618 (named defendant).

*Gregory A. Sharp,* with whom was *Marcus G. Organschi,* for the appellant in Docket No. 14619 (defendant town of Putnam).

*Roger E. Koontz,* for the appellee in both cases (plaintiff).

CALLAHAN, J. The principal issue in this appeal is whether the proceedings before an administrative agency, wherein the agency denied the plaintiff's request for state water quality certification for a proposed hydroelectric facility, constituted a "contested case" under General Statutes § 4-166 (2). The plaintiff, Summit Hydropower Partnership, filed an administrative appeal in the Superior Court from a decision of the named defendant,[1] the commissioner of environmental protection (commissioner), denying its request for water quality certification. The commissioner based his denial on his determination that the proposed facility did not comply with certain state water standards. The Superior Court, *Fuller, J.,* sustained the plaintiff's administrative appeal. The commissioner and the town of Putnam appealed from the trial court's judgment to

[1] The defendants are the commissioner of environmental protection, the water management bureau of the department of environmental protection, the town of Putnam, and the Polymer Corporation.

the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We reverse the judgment of the trial court.

The following facts are relevant. The plaintiff proposed to construct a hydroelectric facility on the Quinebaug River at Cargill Falls in Putnam. Cargill Falls is located at the center of Putnam. Because of its central location and aesthetic appeal, Cargill Falls has historically been regarded, in the words of former Mayor Donald St. Onge, as "a focal point of [the] community." Overlooking the falls, on the east bank of the Quinebaug River, is a town park. The falls and the immediate area make up the landmark which has been depicted on the cover of the Southern New England Telephone Company's directory for the Putnam area.

Since 1730, Cargill Falls has been used for the production of hydropower. The project proposed by the plaintiff would involve the construction of a powerhouse and tailrace next to the existing town dam. The project, when constructed, would be expected to generate approximately 5,400,000 kilowatt-hours per year of electricity. A tailrace is a device that, in this particular case, would continuously reroute the river's flow into the powerhouse and return the water one hundred feet downstream from the point at which the flow had been initially diverted.[2] Because the water coming in upstream from the dam would be diverted through the turbines and discharged farther downstream, the defendants feared that the proposed facility would dry up the falls, leaving in its place "a band of rocks."[3]

---

[2] The proposed project would operate in a "run-of-the-river mode" which means that the river flow rate both upstream and downstream from the dam would not be affected because the water entering the turbines would be continuously released back into the river.

[3] Initially, the plaintiff proposed a minimum stream flow over the spillway of 15 cubic feet per second (cfs), which is significantly less than the

In September, 1988, the plaintiff filed an application with the Federal Energy Regulatory Commission for a license to construct the proposed project. Pursuant to § 401 (a) (1) of the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1341 (a) (1) (1988), commonly known as the Clean Water Act (CWA), the plaintiff also filed a copy of the application with the water management bureau of the Connecticut department of environmental protection and requested certification[4] that the proposed project was

current average annual stream flow of 447 cfs. In response to concerns from the department of environmental protection (department) staff that such minimum flows would not protect aquatic life, the plaintiff proposed a constant minimum stream flow of 58 cfs. Stream flow over the spillway currently exceeds 58 cfs 95 percent of the time. The department staff was concerned that the proposed flat 58 cfs release over the spillway would destroy the aesthetic quality of the fall. Consequently, the plaintiff and the department reached an agreement that the proposed minimum stream flows would range between 80 cfs to 145 cfs. The town, however, was not part of the stipulated agreement because it believed that the variable flow would sacrifice the vigor and natural beauty of the falls area.

[4] Section 401 (a) of the CWA provides in relevant part: "(1) Any applicant for a Federal license or permit to conduct any activity including, but not limited to, the construction or operation of facilities, which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the state in which the discharge originates or will originate, or, if appropriate, from the interstate water pollution control agency having jurisdiction over the navigable waters at the point where the discharge originates or will originate, that any such discharge will comply with the applicable provisions of sections 1311, 1312, 1313, 1316, and 1317 of this title. . . . Such State or interstate agency shall establish procedures for public notice in the case of all applications for certification by it and, to the extent that it deems appropriate, procedures for public hearings in connection with specific applications. In any case where a State or interstate agency has no authority to give such a certification, such certification shall be from the Administrator. If the State, interstate agency, or Administrator, as the case may be, fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request, the certification requirements of this subsection shall be waived with respect to such Federal application. No license or permit shall be granted until the certification required by this section has been obtained or has been waived as

in compliance with federal and state water quality standards.[5] Section 401 certification is a condition precedent to the issuance of a license by the Federal Energy Regulatory Commission to construct and operate a hydroelectric facility.

By letter dated August 10, 1989, the commissioner denied the plaintiff's request for § 401 certification on the ground that the proposed project did not comply with the state's water quality standards.[6] The commissioner noted that the project would adversely affect: "1. the physical, chemical and biological integrity and uninterrupted instantaneous flow of the river; 2. the designated uses for the river, including the recreational use and enjoyment, fish, other aquatic life and wildlife and their habitat, and other legitimate uses of the river;

provided in the preceding sentence. No license or permit shall be granted if certification has been denied by the State, interstate agency, or the Administrator, as the case may be." 33 U.S.C. § 1341 (a) (1988).

The legislative history of § 401 of the CWA, P.L. 92-500, states: "[The] provision [§ 401] makes clear that any water quality requirements established under State law, more stringent than those requirements established under this Act, also shall through certification become conditions on any Federal license or permit. The purpose of the certification mechanism provided in this law is to assure that Federal licensing or permitting agencies cannot override State water quality requirements." S. Rep. No. 92-414, 92d Cong., 2d Sess., reprinted in 1972 U.S. Code Cong. & Admin. News 3735.

[5] Section 303 of the CWA requires that states adopt water quality standards that shall "consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based on such uses." 33 U.S.C. § 1313 (c) (2) (A) (1988). The standards shall take into consideration the "use and value of public water supplies, propagation of fish and wildlife, recreational purposes . . . industrial, and other purposes . . . ." 33 U.S.C. § 1313 (c) (2) (A) (1988).

[6] Pursuant to General Statutes § 22a-426, the water quality standards were adopted by the department of environmental protection and pursuant to § 303 of the CWA were approved by the United States Environmental Protection Agency. Federal regulations require that state water quality standards consist of classifications designating uses for the various waters of the state, water quality criteria sufficient to protect those uses, and an antidegradation policy. See 40 C.F.R. § 131.6.

and 3. the aesthetic quality of the river." The commissioner offered to hold a public hearing on the denial of the plaintiff's request. The plaintiff appealed the commissioner's denial and requested a hearing. The town of Putnam intervened pursuant to General Statutes § 22a-19 and participated in the hearing, which was held in December, 1989, and January, 1990.[7]

At the hearing, an adjudicator appointed by the commissioner heard evidence and testimony and reviewed exhibits. The adjudicator noted that the Cargill Falls area of the Quinebaug River was classified as class C surface water under the state's water quality standards with a goal of achieving class B status. The adjudicator used the class B water quality criteria to evaluate the project.[8] He concluded that the proposed project would substantially reduce the flow over Cargill Falls to "an aesthetically undesirable level" and would impair existing designated recreational uses at the site, including the recreational viewing of the falls. The adjudicator concluded that the proposed project did not comply with the state's water quality standards[9] and recommended that the commissioner uphold his previous denial of the plaintiff's request for § 401 certification.

The plaintiff requested oral argument directly before the commissioner. The commissioner granted the request and received briefs from all parties and heard oral argument in April, 1991. In September, 1991, after reviewing the record of the hearing, the briefs, and a copy of the Federal Energy Regulatory Commission

---

[7] On November 21, 1990, after the record had been closed, Polymer Corporation, an owner of a portion of the water rights at the Cargill Falls Dam, intervened in the administrative proceedings.

[8] The designated uses for class B waters include: recreational use, fish and wild life habitat, agricultural and industrial supply and other legitimate uses including navigation.

[9] The adjudicator also concluded that recreational use, as that term is used in the state's water quality standards, includes the aesthetic quality and out-of-stream recreational uses such as viewing a given water source.

application for the proposed facility, the commissioner affirmed his initial denial of the plaintiff's request and issued his final decision denying the plaintiff's request for § 401 certification. In doing so, the commissioner adopted the adjudicator's conclusion that because the project would drastically reduce the river's flow and impact its recreational uses, it would violate the state's water quality standards.

In October, 1991, the plaintiff appealed the commissioner's decision to the Superior Court purportedly pursuant to General Statutes (Rev. to 1987) § 4-183 (a) of the Uniform Administrative Procedure Act (UAPA).[10] In its appeal, the plaintiff asked that the court reverse the commissioner's final decision denying its request for § 401 certification. On July 20, 1992, the trial court issued its memorandum of decision concluding that the commissioner had improperly denied the plaintiff's request for § 401 certification and directed him to issue a certificate. This appeal followed.

The defendants argue on appeal that the trial court improperly: (1) denied the commissioner's motion to dismiss the plaintiff's administrative appeal because the plaintiff had not adequately exhausted its administrative remedies; (2) concluded that the plaintiff's administrative appeal from the proceedings on its request for § 401 certification constituted a contested case under General Statutes (Rev. to 1987) § 4-166 (2) from which the plaintiff had a right to appeal;[11] (3) concluded that

[10] General Statutes (Rev. to 1987) § 4-183 (a) provided in relevant part: "A person who has exhausted all administrative remedies . . . and who is aggrieved by a final decision in a contested case is entitled to judicial review by way of appeal under this chapter . . . ." See footnote 12.

[11] General Statutes (Rev. to 1987) § 4-166 (2) provided: " 'Contested case' means a proceeding, including but not restricted to rate-making, price fixing and licensing, in which the legal rights, duties or privileges of a party are required by statute to be determined by an agency after an opportunity for hearing or in which a hearing is in fact held, but does not include hearings referred to in section 4-168."

the commissioner had exceeded his authority under state statutes and regulations by denying the plaintiff's request for § 401 certification; (4) concluded that the commissioner had exceeded his authority under federal law by denying the plaintiff's request for § 401 certification; (5) substituted its judgment for that of the commissioner and determined that the commissioner had applied legally vague and undefined aesthetic standards to the plaintiff's request for § 401 certification by denying the request on aesthetics alone; (6) failed to defer to the commissioner's interpretation of the state's water quality standards and the Federal Water Pollution Control Act; and (7) directed the commissioner to issue the requested certification on remand. We conclude that the trial court improperly determined that the plaintiff's appeal had been taken from a contested case and reverse the court's judgment.

The defendants contend that the trial court incorrectly determined that the proceedings before the environmental protection agency constituted a "contested case" under § 4-166 (2). They argue, consequently, that the court improperly concluded that it possessed subject matter jurisdiction over the plaintiff's appeal. We agree.

Judicial review of an administrative decision is a creature of statute. *Tarnopol* v. *Connecticut Siting Council,* 212 Conn. 157, 161, 561 A.2d 931 (1989); *Park City Hospital* v. *Commission on Hospitals & Health Care,* 210 Conn. 697, 702, 556 A.2d 602 (1989). Section 4-183 (a) of the UAPA, at the time this action was filed, provided that "[a] person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision in a *contested case* is entitled to judicial review by way of appeal under this

chapter . . . ."[12] (Emphasis added.) A "contested case" is defined in § 4-166 (2) as "a proceeding . . . in which the legal rights, duties or privileges of a party are required *by statute* to be determined by an agency after an opportunity for hearing or in which a hearing is in fact held . . . ." (Emphasis added.)

The statutory requirement that an appeal to the Superior Court may be taken only from a contested case as defined in § 4-166 (2) is an obvious indicator that the legislature did not intend to authorize a right of appeal to the Superior Court from every determination of an administrative agency. See *New England Dairies, Inc.* v. *Commissioner of Agriculture,* 221 Conn. 422, 427, 604 A.2d 810 (1992); *Connecticut Bank & Trust Co.* v. *Commission on Human Rights & Opportunities,* 202 Conn. 150, 154, 520 A.2d 186 (1987). "The UAPA grants the Superior Court jurisdiction over appeals of agency decisions only in certain limited and well delineated circumstances." *New England Dairies, Inc.* v. *Commissioner of Agriculture,* supra.

"[W]e have determined that even in a case where a hearing is 'in fact held,' in order to constitute a contested case, a party to that hearing must have enjoyed a statutory right to have his 'legal rights, duties, or privileges' determined by that agency holding the hearing. . . . In the instance where no party to a hearing enjoys such a right, the Superior Court is without jurisdiction over any appeal from that agency's determination." (Citations omitted.) Id. In *Herman* v. *Division of Special Revenue,* 193 Conn. 379, 382, 477 A.2d 119 (1984), we stated: "The test for determining contested case status has been well established and requires an inquiry into three criteria, to wit: (1) whether a legal right, duty or privilege is at issue, (2) and is *statutorily*

---

[12] Because this proceeding before the commissioner commenced on or about April 8, 1988, it is governed by the provisions of the UAPA in effect prior to July 1, 1989. Public Acts 1988, No. 88-317, §§ 1, 23.

required to be determined by the agency, (3) through an opportunity for hearing or in which a hearing is in fact held." (Emphasis added.)

In April, 1992, the defendants filed a motion in the Superior Court to dismiss the plaintiff's action based on the lack of subject matter jurisdiction. In their motion the defendants claimed, among other things that the administrative proceeding, in which the § 401 certification had been determined adversely to the plaintiff, was not a "contested case" as defined in § 4-166 (2).[13]

The trial court denied the defendants' motion to dismiss. In its memorandum of decision addressing the defendants' motion, the court concluded that the plaintiff's appeal was from a contested case as defined in § 4-166 (2) and that the court had subject matter jurisdiction over the appeal. The trial court noted that the proceedings before the commissioner satisfied *Herman's* three-pronged test. Specifically, the trial court, in addressing the first two prongs of the *Herman* test, stated that the plaintiff was legally required to obtain a § 401 certificate from the commissioner as a prerequisite to obtaining a federal license to build the proposed hydroelectric facility and that the commissioner was required by statute to determine such right after providing an opportunity for a meaningful hearing. The trial court finally noted that because a hearing in fact had been held, regardless of whether it was statutorily mandated, the third prong of the *Herman* test was satisfied and that consequently the plaintiff had a right to appeal.

It is undisputed that the § 401 certification process is part of a licensing scheme in which the plaintiff's

---

[13] The commissioner also argued that the trial court did not have subject matter jurisdiction because the plaintiff had not exhausted its administrative remedies because it failed to seek a declaratory ruling pursuant to General Statutes § 4-176.

right to a certificate is placed in issue. Under § 4-166 (6) of the UAPA, a "license" is defined to include "the whole or part of any agency permit, certificate, approval, registration, charter or similar form of permission required by law . . . ." Even if, however, the plaintiff had a legal right or privilege to § 401 certification, and even if that right or privilege was denied in a proceeding before the commissioner, the plaintiff does not have a right to appeal unless the commissioner was *statutorily* required to determine the plaintiff's legal right or privilege to § 401 certification in a hearing or after an opportunity for a hearing. See, e.g., *Lewis* v. *Gaming Policy Board,* 224 Conn. 693, 700–701, 620 A.2d 780 (1993) (gaming policy board was not required by statute to provide a hearing to determine the continued employment of former head of the lottery unit after his employment was terminated); *New England Dairies, Inc.* v. *Commissioner of Agriculture,* supra, 429 (commissioner of agriculture was not required by statute to determine a milk dealer's right to a license after an opportunity for a hearing); *Rybinski* v. *State Employee's Retirement Commission,* 173 Conn. 462, 471, 378 A.2d 547 (1977) (commission was not required by statute to provide an opportunity for a hearing prior to denying a state employee's written request to change retirement plans); *Taylor* v. *Robinson,* 171 Conn. 691, 697, 372 A.2d 102 (1976) (parole board had no statutory obligation to determine if a prisoner should be released from parole).

If the plaintiff's rights or privileges were not statutorily required to be determined by the agency in a hearing or after an opportunity for a hearing, a "contested case" would not exist and the plaintiff would have no right to appeal pursuant to § 4-183 (a). To ascertain whether a statute requires an agency to determine the legal rights or privileges of a party in a hearing or after an opportunity for a hearing, "we need to

examine all the statutory provisions that govern the activities of the particular agency or agencies in question." *Lewis* v. *Gaming Policy Board,* supra, 701. Because the commissioner was governed in this proceeding by both state and federal statutes, we need to review both state and federal legislation to determine whether the proceedings before the commissioner constituted a contested case.[14]

The trial court noted in its memorandum of decision that the commissioner was required by federal law, specifically § 401 (a) (1) of the CWA, to determine the plaintiff's right to § 401 certification. That section provides, in relevant part, that each state "shall establish procedures for public notice in the case of all applications for certification by it and, to the extent that it deems appropriate, procedures for public hearings in connection with specific applications." 33 U.S.C. § 1341 (a) (1) (1988).

The trial court concluded that because obtaining § 401 certification is, pursuant to federal law, a prerequisite for obtaining a license to construct the proposed hydroelectic project, the commissioner was statutorily required to determine the plaintiff's right to certification in a hearing or after an opportunity for a hearing. The trial court supported its conclusion by noting that the state statutes governing the scope of authority of the commissioner suggest that the commissioner was statutorily required to determine the plaintiff's right to § 401 certification in a hearing or after an opportunity for a hearing. It noted, for instance, that

---

[14] Although not addressed by the parties to this case, it is far from clear whether the "required by statute" language in General Statutes (Rev. to 1987) § 4-166 (2) does in fact refer to federal statutory law. Because the parties assume that reference should be made to both state and federal law in order to assess whether the commissioner was required by statute to determine the plaintiff's request for § 401 certification, we assume, strictly for the purposes of this appeal, that the "required by statute" language incorporates federal statutory law.

General Statutes § 22a-424 provides in relevant part that the commissioner shall have the following powers: "(g) To hold such hearings as may be required under the provisions of this chapter and the federal Water Pollution Control Act and other applicable federal law, for which he shall have the power to issue notices by certified mail, administer oaths, take testimony and subpoena witnesses and evidence . . . (k) To exercise all incidental powers necessary to carry out the purpose of this chapter and the federal Water Pollution Control Act . . . ." The trial court inferred from the grant of these powers that the legislature had intended the commissioner to exercise them in such a fashion as to require a hearing or an opportunity for a hearing to those individuals requesting § 401 certification. We disagree.

Although the commissioner clearly afforded the plaintiff a hearing that in fact was held, the commissioner was not statutorily required to do so. Neither § 401 of the CWA nor General Statutes § 22a-424 required the commissioner to determine the plaintiff's right to § 401 certification in a hearing. The procedures that any state need adopt to process § 401 water quality certification requests are determined by the statutes promulgated by each state. See *Keating* v. *Federal Energy Regulatory Commission,* 927 F.2d 616, 622 (D.C. Cir. 1991); *Roosevelt Campobello International Park* v. *United States Environmental Protection Agency,* 684 F.2d 1041, 1056 (1st Cir. 1982); see also *Mobile Oil Corporation* v. *Kelley,* 426 F. Sup. 230, 234 (S.D. Ala. 1976) ("certification under Section 401 is set up as an exclusive p[r]erogative of the state and is not to be reviewed by [the Environmental Protection Agency] or any agency of the federal government"). The plain wording of § 401 requires only that a state agency be authorized to establish procedures to determine whether submitted requests for § 401 certification are meritori-

ous. Moreover, the legislative history of § 401 is devoid of any legislative mandate that the designated state agency require a § 401 certification hearing. The most applicable legislative history reads: "[The] provision [§ 401] makes clear that any water quality requirements established under State law, more stringent than those requirements established under this Act, also shall through certification become conditions on any Federal license or permit. The purpose of the certification mechanism provided in this law is to assure that Federal licensing or permitting agencies cannot override State water quality requirements." S. Rep. No. 92-414, 92d Cong., 2d Sess., reprinted in 1972 U.S. Code Cong. & Admin. News 3735. Although it is abundantly clear that the commissioner is statutorily authorized to establish procedures to determine requests for § 401 certification, it does not follow that he is statutorily required to provide a hearing to make those determinations. See *Triska* v. *Department of Health & Environmental Control,* 292 S.C. 190, 196–97, 355 S.E.2d 531 (1987) (court did not find that § 401 of the federal CWA required that the agency determine a party's right to a § 401 certificate in a hearing).

Nor does General Statutes § 22a-424 require that the commissioner provide a hearing to determine the plaintiff's § 401 certification request. Section 22a-424 merely authorizes the commissioner to establish certain procedures and to exercise certain powers incidental thereto. To conclude that § 22a-424 mandates that the commissioner make a § 401 determination in a hearing or after an opportunity for a hearing would confuse "can" with "must" and would establish by judicial fiat a statutory requirement that the legislature did not in fact create. "The intent of the legislature, as this court has repeatedly observed, is to be found not in what the legislature meant to say, but in the meaning of what it did say." *Burnham* v. *Administrator of the Unemployment*

*Compensation Act,* 184 Conn. 317, 325, 439 A.2d 1008
(1981); *Federal Aviation Administration* v. *Adminis-
trator of the Unemployment Compensation Act,* 196
Conn. 546, 549–50, 494 A.2d 564 (1985). Neither our
state statutes nor applicable federal statutes include
any reference to a required hearing to determine § 401
certification requests. The applicable statutes, if they
imply anything, imply only that Congress and the Gen-
eral Assembly intended that the commissioner estab-
lish procedures to determine the legal rights of
applicants seeking § 401 certification. The degree of
procedural formality that the commissioner was to pro-
vide to adjudicate such claims, however, was clearly
left to his discretion. Consequently, in the absence of
an express statutory requirement that the commis-
sioner afford a hearing to determine the plaintiff's
entitlement to § 401 certification, the trial court
improperly concluded that the proceedings wherein the
plaintiff's § 401 certificate was denied constituted a
contested case under § 4-166 (2).

Our conclusion is consistent with the holding of the
South Carolina Supreme Court in *Triska* v. *Department
of Health & Environmental Control,* supra. In *Triska,*
the court addressed the issue of whether its state
environmental agency's denial of a § 401 certificate
constituted a contested case from which a party had
a right to judicial review of the agency's decision under
South Carolina's administrative procedure act. The
South Carolina agency in question had held a hearing
on and denied a § 401 certification request. The plain-
tiff who had requested § 401 certification appealed that
decision to the trial court. The trial court sustained the
appeal. The South Carolina Supreme Court, after
examining the statutes applicable to the § 401 certifi-
cation process, held that "[t]here is no requirement in
South Carolina law or Federal law that there be an

opportunity for a hearing in a 401 Certification, and therefore, a 'contested case' does not exist in which an adjudicatory hearing is required."[15] Id., 196–97.

The plaintiff argues, however, that under the plain meaning of § 4-166 (2) there is no requirement that a hearing must be statutorily mandated in order to qualify for contested case status. The plaintiff urges us to construe the phrase "or in which a hearing is in fact held" in § 4-166 (2) to stand independently of the "required by statute" language preceding it. The plaintiff argues that once the first two prongs of the test set forth in *Herman* v. *Division of Special Revenue,* supra, 382, are satisfied, that is, once there exists a right, duty or privilege at issue that an agency is required by statute to determine, then it is irrelevant whether any hearing held to determine such right, duty or privilege is required by statute. Therefore, according to the plaintiff, any time a hearing is provided by an agency, that hearing, even if gratuitous, would satisfy *Herman's* third prong and, assuming the satisfaction of the first two prongs, render such a proceeding a contested case for the purpose of § 4-166 (2).[16] Otherwise, the plaintiff asserts, the "hearing in fact" language contained in § 4-166 (2) would be superfluous, a result not likely to have been intended by the legislature because " ' "statutes should be construed so that no part of a legislative enactment is to be treated as insignificant and unnecessary, and there is a presump-

---

[15] Section 1-23-310 (2) of the South Carolina Code of Laws Annotated (1986) defines "contested case" as "a proceeding . . . in which the legal rights, duties, or privileges of a party are required by law to be determined by an agency after an opportunity for a hearing . . . ." Like Connecticut's definition of a contested case, the South Carolina definition is derived from the 1961 Uniform Model Act. See Model State Administrative Procedure Act (1961) § 1 (2), 14 U.L.A. 137 (1980).

[16] The trial court also noted that "[t]he third requirement, however, is that a statute either require an opportunity for a hearing or in which a hearing is in fact held . . . The statute does not require both."

tion of purpose behind every sentence, clause or phrase in a legislative enactment." ' " *84 Century Limited Partnership* v. *Board of Tax Review,* 207 Conn. 250, 263, 541 A.2d 478 (1988). We are unpersuaded.

" 'In construing a statute, common sense must be used, and courts will assume that the legislature intended to accomplish a reasonable and rational result.' " *King* v. *Board of Education,* 203 Conn. 324, 332–33, 524 A.2d 1131 (1987). Legislative intent is not to be found in an isolated phrase or sentence. *Gentry* v. *Norwalk,* 196 Conn. 596, 606, 494 A.2d 1206 (1985). When § 4-166 (2) is read as a whole, it is evident that the phrase "required by statute to be determined by an agency after an opportunity for hearing" cannot be divorced from the phrase "or in which a hearing is in fact held." If it were otherwise, every time an agency gratuitously conducted a hearing, a "contested case" could be spawned. Such an interpretation of § 4-166 (2) would chill, to the detriment of those petitioning the agency, the inclination of an agency to hold any type of an inquiry to gather information when it was not required by statute to do so. We believe, consequently, that the phrase "or in which a hearing is in fact held" was not intended by the legislature to mean that if a hearing, not required by statute, is in fact held by agency dispensation, it will result in a contested case. Rather, a hearing must be statutorily required before a matter achieves contested case status.

Moreover, although the definition of "contested case" in § 4-166 (2) is a grammatical quagmire, the legislative history and policy underlying it suggest that we interpret the "hearing is in fact" language as being intrinsically connected to the "required by statute" language therein so that in order for a hearing to result in a contested case, the hearing must be statutorily required to be held by the agency. The phrase contained in § 4-166 (2), "or in which a hearing is in fact held," was

appended to the original definition of contested case in 1973.[17] This addition was part of an amendment proposed from the floor of the House of Representatives on May 15, 1973. Public Acts 1973, No. 73-620, § 2. At that time, Representative Russell L. Post, Jr., stated that the proposed amendment sought "to correct an ambiguity created by a Court decision within the last month having to do with the definition of contested cases . . . ." 16 H.R. Proc., Pt. 13, 1973 Sess., p. 6436. The case apparently referred to by Representative Post is *McAuliffe* v. *Carlson,* 30 Conn. Sup. 118, 303 A.2d 746 (1973), which was published in the May 1, 1973 issue of the Connecticut Law Journal.

In *McAuliffe* v. *Carlson,* supra, the plaintiff had sought an appeal from an administrative ruling refusing him reimbursement of payments that he had made for his care in a security treatment center. The ruling in question was not made in a hearing or after an opportunity for a hearing, and no statute required that it be made in such a fashion. Id., 119. The court in *McAuliffe* noted: "The General Assembly did not desire to make the UAPA a vehicle for appeal of any and all administrative orders or decisions made by a state agency. The act was clearly designed to permit appeals only upon compliance with the statutory conditions set forth therein, including the specific provisions for the conduct of a hearing, or the opportunity for a hearing." Id., 120–21. In discussing the issue of whether a hear-

[17] An examination of the definition of a "contested case" in other jurisdictions that, like Connecticut, adopted the 1961 Model State Administrative Procedure Act's version of contested case; see Model State Administrative Procedure Act (1961) § 1 (2), 14 U.L.A. 137 (1980), reveals that the phrase "or in which a hearing is in fact held," as appended to the original definition of contested case in General Statutes § 4-166 (2), appears only in the Connecticut statute.

The federal statute states that the provisions pertaining to formal adjudication apply "in every case of adjudication required *by statute* to be determined on the record after opportunity for an agency hearing . . . ." (Emphasis added.) 5 U.S.C. § 554 (a) (1988).

ing was statutorily required, the court noted that such a requirement underscores the importance that appeals from administrative agency decisions be available only from formal adjudications. Id., 121. The court concluded that because there was no statute requiring that the agency make a determination in a formal hearing of the plaintiff's right to reimbursement, the plaintiff had not appealed from a contested case. The court at one point in its memorandum, however, stated: "Nevertheless, it was not a 'contested case' permitting judicial review thereof, under the UAPA, since no hearing was required, *or held.*" (Emphasis added.) Id., 120.

It appears that, by amending § 4-166 (2) to add the phrase "or in which a hearing is in fact held" to the definition of contested case, the legislature was not manifesting its intention to provide judicial review whenever an agency furnished a gratuitous hearing, but sought rather to maintain the rigid requirements for a contested case by eliminating any possible confusion generated by the ambiguous language in *McAuliffe* that a determination by an agency after a hearing was held, without a *statutory* right to a hearing, would be sufficient to constitute a contested case. We therefore reject the plaintiff's contention that the "hearing is in fact" language in § 4-166 (2) was appended to transform every administrative proceeding in which a hearing is accorded into a contested case even if a hearing is not statutorily required.

Our conclusion is further supported by the desirability of ensuring that "the legislature, rather than the agencies, has the primary and continuing role in deciding which class of proceedings should enjoy the full panoply of procedural protections afforded by the UAPA to contested cases, including the right to appellate review by the judiciary. Deciding which class of cases qualify for contested case status reflects an important matter of public policy and 'the primary

responsibility for formulating public policy must remain with the legislature.' *State* v. *Whiteman,* 204 Conn. 98, 103, 526 A.2d 869 (1987); see *Kellems* v. *Brown,* 163 Conn. 478, 491, 313 A.2d 53 (1972), appeal dismissed, 409 U.S. 1099, 93 S. Ct. 911, 34 L. Ed. 2d 678 (1973)." *Lewis* v. *Gaming Policy Board,* supra, 709.[18]

In summary, we read § 4-166 (2) as manifesting a legislative intention to limit contested case status to proceedings in which an agency is *required by statute* to provide an opportunity for a hearing to determine a party's legal rights or privileges.[19] No such statute mandated that the commissioner hold a hearing to determine the plaintiff's entitlement to § 401 certification. We conclude therefore that the proceeding in which the plaintiff's request for such certification was

[18] Although the plaintiff cannot appeal to the Superior Court from the administrative decision denying its § 401 certification request under the UAPA, it is not without recourse. It may still petition the commissioner for a declaratory ruling pursuant to General Statutes § 4-176 as to whether the state's water quality standards were properly applied to the plaintiff's proposed project. Section 4-176 provides in relevant part: "(a) Any person may petition an agency, or an agency may on its own motion initiate a proceeding, for a declaratory ruling as to the validity of any regulation, or the applicability to specified circumstances of a provision of the general statutes, a regulation, or a final decision on a matter within the jurisdiction of the agency."

[19] Since the decision in *Herman* v. *Division of Special Revenue,* 193 Conn. 379, 382, 477 A.2d 119 (1984), this court has interpreted General Statutes § 4-166 (2) to limit a "contested case" to a proceeding in which an agency has been statutorily required to determine a party's legal interest in a hearing or after an opportunity for a hearing. See *Lewis* v. *Gaming Policy Board,* 224 Conn. 693, 701, 620 A.2d 780 (1993); *New England Dairies, Inc.* v. *Commissioner of Agriculture,* 221 Conn. 422, 429, 604 A.2d 810 (1992). If our interpretation had been incorrect, the legislature surely would have undertaken to amend the statute. The legislature has not done so, even though it has enacted other major revisions of the Uniform Administrative Procedure Act since that time. Such legislative inaction is indicative of legislative acquiescence in our interpretation of § 4-166 (2). *Farmers & Mechanics Savings Bank* v. *Garofalo,* 219 Conn. 810, 817, 595 A.2d 341 (1991); *Scheyd* v. *Bezrucik,* 205 Conn. 495, 506, 535 A.2d 793 (1987); *Phelps Dodge Copper Products Co.* v. *Groppo,* 204 Conn. 122, 134, 527 A.2d 672 (1987).

denied was not a contested case and was therefore not a final decision from which the plaintiff had a right to appeal pursuant to § 4-183 (a). Consequently, we reverse the judgment and order the trial court to dismiss the plaintiff's administrative appeal for lack of subject matter jurisdiction.

The judgment is reversed and the case is remanded with direction to dismiss the plaintiff's appeal.

In this opinion the other justices concurred.